**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| FORD MOTOR CREDIT CO. LLC | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:10-CV-1926** |
| | : | **(JUDGE MARIANI)** |
| **PETER J. MAXWELL** et al., | : | |
| | : | |
| **Defendants** | : | |
| **v.** | : | |
| | : | |
| **CHESTER STEWART** | : | |
| | : | |
| **Third Party Defendant** | : | |

## MEMORANDUM OPINION

### I. Introduction

Before the Court are Motions for Summary Judgment filed by Ford Motor Credit

("FMC") (Doc. 101) and by Third-Party Defendant Chester Stewart ("Stewart") (Doc. 99).

The sole remaining claims in the case are FMC's breach of contract claim against

Defendants Peter and Sharon Maxwell ("Maxwells") and Thomas and Lori Smith ("Smiths")

based on a pair of continuing guaranties executed in favor of FMC, and Smith Defendants'

claim for breach of contract against Stewart based on a stock sale agreement between

Maxwells and Smiths as buyers and Stewart as seller. The motions have been fully briefed

by FMC, Smith Defendants, and Stewart, while Maxwell Defendants did not submit any

briefing in connection with FMC's motion. The matters are ripe for disposition, and for the

reasons that follow, the Court will grant both motions for summary judgment as to liability and order supplemental briefing on FMC's damages.

## II. **Undisputed Statement of Facts[1]**

### As to FMC

On February 1, 1988, Heritage Ford, Inc. ("Heritage"), through Stewart, executed an Automotive Wholesale Plan Application for Wholesale Financing ("Wholesale Agreement") with FMC. (Doc. 103-1, Ex. A). Under the terms of the Wholesale Agreement, "[a]ny and all proceeds of any sale or lease or other disposition of the Merchandise by Dealer shall be received and held by Dealer in trust for Ford Credit and shall be fully, faithfully and promptly accounted for and remitted by Dealer to Ford Credit to the extent of Dealer's obligation to Ford Credit with respect to the Merchandise." (*Id*. at ¶ 5). Heritage financed its purchases of new and used cars through FMC under the terms of the Wholesale Agreement. (Smith Defs.' SMF, Doc. 108, ¶ 3, Stewart SMF, Doc. 109, ¶ 3).

FMC provided financing (defined as "advances") for "the invoice or contract amount . . . directly to Dealer with respect to Merchandise of any type held by Dealer for sale." (Wholesale Agreement at ¶ 1). The Wholesale Agreement defined "default" as, among other things, failure "to promptly pay any amount now or hereafter owing to Ford Credit as and when the same shall become due and payable," or failure "to duly observe or perform

---

[1] The following recitation is a statement of undisputed facts. To the extent a dispute exists, the Court will so note. Furthermore, as to Stewart's statement of material undisputed facts, Smith Defendants have admitted the existence and their acceptance of the Stock Sale Agreement and Continuing Guaranties. Therefore, despite their purported denials of Stewart's statement of material facts located at paragraphs 3, 6, 8, 9, 12, 13, 14, 15, 17, 20, and 22, claiming that the referenced documents are "writings, the terms of which speak for themselves and the meaning of which is for the Court to determine," the Court will deem those "denials" as admissions.

2

any other obligation secured hereby." (*Id.* at ¶ 9(a), (b)). If Heritage defaulted on its obligations, FMC could "accelerate and declare immediately due and payable, all or any part of the unpaid balance of all Advances made hereunder together with accrued interest," and could also "take immediate possession of all property in which it has a security interest." (*Id.* at ¶ 9). Finally, the Wholesale Agreement stated that Heritage "agrees that the acceptance by Ford Credit of any payment after it may have become due or the waiver by Ford Credit of any other default shall not be deemed to alter or affect Dealer's obligations or Ford Credit's right with respect to any subsequent payment or default." (*Id.* at ¶ 10).

Also on February 1, 1988, Heritage executed a Security Agreement ("Security Agreement"). (Doc. 103-2, Ex. B). The Security Agreement granted to FMC a security interest in "[a]ll furniture, fixtures, machinery, supplies and other equipment," "[a]ll motor vehicles, tractors, trailers, implements, service parts and accessories and other inventory of every kind," and "[a]ll accounts, contract rights, chattel paper and general intangibles." (*Id.* at ¶¶ a, b, c). The Security Agreement provided that in the event of Heritage's default, FMC was entitled to "the remedies of a secured party under the Uniform Commercial Code including, without limitation, the right to take possession of the Collateral" and to "sell the same at public or private sale" and to "apply the proceeds of such sale or disposition . . . to the partial or complete satisfaction of any indebtedness or obligation of the undersigned" to FMC. (*Id.*).

On July 6, 2007, Maxwell and Smith Defendants executed a Stock Sale Agreement with Stewart to obtain Stewart's ownership interest in Heritage. (Stock Sale Agreement, Doc. 99-9, Ex. F). In response to the question, "[w]hen you buy the stock of an entity, the entity continues, agreed?" Lori Smith answered, "[c]orrect." (L. Smith Dep., Doc. 99-11, Ex. H, at 283:12-14). In response to the follow-up question, "regardless of when an obligation is incurred, it's still an obligation of the entity, agreed?" she answered, "I agree." (*Id.* at 283:15-17). Lori Smith also conceded that there was no provision in the Stock Sale Agreement that required Stewart to pay off the existing obligations of Heritage as of the date of closing, despite what she may have thought at the time of closing. (*Id.* at 359:2-6).

On October 1, 2007, Maxwell Defendants executed a Continuing Guaranty to FMC. (Doc. 103-3, Ex. C). That same day, Smith Defendants executed a Continuing Guaranty to FMC. (Doc. 103-4, Ex. D). Under the Maxwell and Smith Guaranties (collectively, "Guaranties"), Defendants "unconditionally" guaranteed that "Dealer [Heritage] will fully, promptly, and faithfully perform, pay and discharge all Dealer's present and future obligations," and agreed, without FMC first having to proceed against Heritage, "to pay on demand all sums due and to become due" to Ford Credit from Heritage and "all losses, costs, attorney's fees or expenses" which FMC "may suffer by reason of Dealer's default. . . ." (Doc. 103-3, Doc. 103-4). Each defendant also agreed under the Guaranties "to be bound by and on demand to pay any deficiency established by a sale of paper or security

4

held with or without notice," "together with a reasonable attorney's fee (15% if permitted by law) if placed with an attorney for collection. . . ." (*Id.*).

Peter Maxwell confirmed that FMC had withdrawn Heritage's line of credit on August 31, 2007 and conditionally reinstated the line of credit on October 25, 2007 after Maxwell and Smith Defendants executed the Guaranties. (P. Maxwell Dep., Doc. 109-3, Ex. C, at 106:11-18). FMC conducted an audit of Heritage on November 14, 2007 and another on December 6, 2007. (Kasper Dep., Doc. 108-1, Ex. A, at 61:5-14, 63:6-18). Ford conducted the audits because of concerns related to "a possible change in ownership" of which FMC had been unaware. (*Id.* at 22:8-12; Stewart Dep., Doc. 106-1, Ex. B, at 56:18-57:5, 65:17-24, L. Smith Dep., Doc. 106-1, Ex. A, at 112:3-4). After the second audit, FMC concluded that sixteen vehicles had been sold "out of trust"[2] totaling $355,000 as of December 6, 2007. By December 10, 2007, $273,219 of the out of trust amount remained unpaid. (Kasper Dep. at 64:8-17). On December 12, 2007, FMC again withdrew Heritage's line of credit. (P. Maxwell Dep. at 106:19-23). FMC declared Heritage to be in default (Mullen Aff., Doc. 103, at ¶ 23), and "Heritage ceased business operations for all purposes on or about December 24, 2007." (Smith Answer, Doc. 23, at ¶ 2; *see also* Maxwell Answer, Doc. 32, at ¶ 2).

---

[2] Ford defines "out of trust" to be a situation in which a dealership defaults on its Wholesale Agreement; that is, it sells vehicles "subject to Ford's security interest but fail[s] to either remit payment for those vehicles to Ford Credit, or to hold proceeds from the sales in trust for Ford Credit as required by the Wholesale Agreement." (Mullen Aff., at ¶¶ 21, 22).

5

FMC then issued demand letters on the Maxwell and Smith Defendants in September 2009 seeking the balance outstanding as of August 2008 in the amount of $474,176.85, plus interest. (Doc. 104, Exs. 7, 8, 9, 10). Defendants never tendered the amount demanded to FMC. (Maxwell Answer at ¶ 46; Smith Answer at ¶ 46). FMC now seeks $844,433.84 in damages from Defendants.

## As to Stewart

Prior to the sale, Smith Defendants had been involved in several business and financial ventures. Lori Smith had been a certified financial planner for twelve years and had approximately 500 clients. (L. Smith Dep., Doc. 99-11, Ex. H, at 170:4-171:18). Tom Smith had operated a used car and service lot known as Smith Motors, and had previously been the Finance Manager and General Manager at Heritage from 1991 to 1998. (T. Smith Dep., Doc. 99-12, Ex. I, at 94:1-12; Prospective Dealer Application, Doc. 99-14, Ex. K, at 2).

Stewart, as Seller, sold his interest in Heritage to Maxwell and Smith Defendants, collectively as Buyers, on July 6, 2007. (Stock Sale Agreement, at 1). At the time of closing, Stewart owned 91% of the common stock of Heritage, while Peter Maxwell ("Maxwell") held the remaining 9%. (*Id.*). The total purchase price was $500,000, and closing took place on the same day that the Stock Sale Agreement was signed. (*Id.* at 15). At all times during the negotiations and at the closing, Smith Defendants were represented by counsel, James Bohorad. (T. Smith Dep. at 14:16-19).

The Stock Sale Agreement states that "Maxwell has been employed by Heritage for many years as its general manager and is thoroughly familiar with all of its operations, financial books and records and other corporate records." (*Id.* at 1-2). Among other things, the Agreement provides the following Seller's representations and warranties:

4F. *Title to Properties.* To the best of the knowledge and belief of Seller, except as otherwise set forth herein, the Corporations [Heritage and Kia] own outright, and have good and marketable title to, all of their personal property free and clear of all liens, pledges, security interests, conditional sales contracts or other encumbrances of any nature whatsoever, except for the lien of current taxes not yet due and payable.

4H. *Absence of Undisclosed Liabilities.* To the best of the knowledge and belief of Seller, the Corporations have no liabilities or obligations accrued, absolute, contingent or otherwise, except as disclosed in this Agreement or as incurred, consistent with past business practice, in the normal and ordinary course of its business since the date of the Financial Statements and none of which is material.

4N. *Disclosure.* No representation or warranty by the Seller in this Agreement or in any other exhibit, list, certificate or document delivered pursuant to this Agreement, contains or will contain any material omission or untrue statement of material fact.

4O. *Financial Information.* To the best of Seller's knowledge, all corporate records and financial information regarding Heritage and Kia made available by Seller to Buyers for review, including, but not limited to, books, records and tax returns, is [*sic*] true and accurate.

13. *Conduct Pending the Closing.* The Sellers hereby covenant and agree that, pending the Closing and except as otherwise approved in advance in writing by the Buyers:

. . .

B. *Access.* To the extent that any of the following are known to or in the possession or control of Seller and not otherwise available to Maxwell, the

7

Buyers and their authorized representatives shall have full access during normal business hours upon prior arrangement with the Seller to the Properties, books, records, contracts and documents of Heritage and Kia known to and/or in the possession or control of Seller.

(*Id.* at ¶¶ 4, 13). In turn, the Buyers' representations including the following statements:

A. Buyers have had full and unrestricted access to the books and records of Heritage and Kia and have complete knowledge of the financial condition, assets and liabilities of Heritage and Kia.

B. Maxwell acknowledges that he has been an active participant in the management of Heritage and Kia and that he is fully familiar with its financial condition, assets and liabilities. Smith agrees and acknowledges that he shall be charged with such knowledge as a result of his relationship to Maxwell.

C. Buyers are not relying on any representation or warranty of the Seller other than those contained in this Agreement, but rely on their own independent knowledge and investigation of the subject matter of this transaction as the Buyers shall have determined to be appropriate.

(Stock Sale Agreement, ¶ 5). Finally, both Buyers and Seller agreed to the following:

*Further Assurances.* Buyer and Seller will, at the request of the other from time to time, execute and deliver such further instruments and will take such other action reasonably required to consummate the transactions contemplated by this Agreement.

(*Id.* at ¶ 10(H)).

Before closing, Attorney Bohorad and Smith Defendants' accountant, Theresa Pothering, believed there were financial issues with regard to the dealership. Specifically, they believed that certain numbers were not adding up and that they had not received all of the financial documents they had requested. (Bohorad Dep., Doc. 99-10, Ex. G, at 66:18-67:12, 73:4-17; Pothering Dep., Doc. 106-1, Ex. E, at 53:16-23, 59:25-60:1, 76:6-25, 82:9-

8

11, 98:1-5, 103:23-25, 110:17-20). Tom Smith was aware that Pothering had some concerns prior to closing about the possibility that Heritage was "out of trust" with FMC. (T. Smith Dep. at 303:22-304:8) ("I recall a conversation prior to closing that, you know, there was a concern that I relayed from Theresa, and [Bohorad] said it would be handled at closing.").

According to Tom Smith, he agreed to the language in the final Stock Sale Agreement despite his reservations about the financial state of Heritage because he "felt those were put to rest or I wouldn't have went to closing." (Id. at 352:11-15). Smith was then asked, "they were put to rest because you relied upon your attorney to do so?" to which he responded, "[y]es." (Id. at 352:16-18). As a follow-up question, Smith was asked "[b]ut not because of anything that Chet said to you in any fashion because again you never spoke with him, agreed?" Smith answered, "[a]greed." (Id. at 352:19-22).

Pothering's notes indicate she had ongoing difficulty obtaining information she had requested about Heritage's financial condition: "Informed Client that still did not receive information. Per Pete – prior accountant refuses to send the information – Per Pete prior accountant . . . said that he already provided all of the requested information to Chet. Requested that Pete ask Chet to forward information previously requested. Also requested remaining current information again." (Pothering Notes, Doc. 99-17, Ex. N, at Smith 1730 (6/2007 entry)). Pothering also noted that all contact was going through Peter Maxwell. "Tom [Smith] informed me that he will not be speaking to Chet [Stewart] directly and that

9

[Maxwell] will be handling negotiations with [Stewart]." (*Id.* at Smith 1728 (4/4/2007 entry)).

Though Stewart claimed that he never spoke directly with the Smiths (Stewart Dep. at

51:10-13), he did admit that he received a request for information from the Smiths through

Maxwell. (*Id.* at 52:16-23) ("Pete called me and told me that their accountant wanted some

statements and so forth and year-end statements."). In response to this request, Stewart

"told [Maxwell] to give them whatever they needed." (*Id.* at 53:2-3). Another entry dated

June 11, 2007 in Pothering's notes states:

Call to Jim Bohorad – discussed information not received from prior accountant and issues with current financial information not received. Per Jim – all will be handled in the sales agreement and in finalized negotiations. I told Jim that I was not comfortable with the sale due to the information not being provided, Jim agreed and will handle negotiating for the information previously not provided.

(Pothering Notes at Smith 1730 (6/11/2007 entry)). With respect to ¶ 4(O) of the Stock Sale

Agreement, when asked "[w]hat information or knowledge do you have here sitting today

that Chet knew that the records and financial information made available to you was not

accurate?" Lori Smith responded, "I don't know what Chet knew." (*Id.* at 293:23-294:1). Lori

Smith responded "[y]es" to the question, "let's go with what you mentioned before, car

expenses. They would have been incurred in the ordinary course, agreed?" (L. Smith Dep.

at 292:23-293:1).

Tom Smith stated he spoke to Stewart only once prior to closing, and it was via

conference call on July 5, 2007, the day before closing. (T. Smith Dep. at 131:16-132:7).

According to Smith, the substance of the conversation was only "Chet's wanting a car and a

10

motorcycle turned over to him that he owned it as part of the deal, and I think part of the question came up with security deposits or something on the land, on the rental property." (*Id*. at 132:16-20).

Smith Defendants were aware at the time they purchased Heritage that it had existing franchise agreements with FMC and Kia Motors America. Furthermore, they were aware that Heritage had floor financing in place with FMC through which FMC had a security interest in the inventory of cars at Heritage. (Smith Schuylkill County Complaint, Doc. 99-13, Ex. J, at ¶¶ 21, 26; L. Smith Dep. at 465:20-466:24; Bohorad Dep. at 48:10-24, 110:7-12). With respect to ¶ 4(F): Title to Properties of the final Stock Sale Agreement, when asked what was inaccurate about the paragraph, Lori Smith responded, "nothing." (L. Smith Dep. at 279:9-12). Finally, Smith Defendants were aware at the time they purchased Heritage that Ford would have to approve them as dealers before they could operate the dealership. (T. Smith Dep. at 122:16-23; Bohorad Dep. at 48:1-9; *see also* Smith Prospective Dealer Application (dated March 26, 2007)). According to the terms of the Prospective Dealer Application, it "obligates neither the Applicant nor Ford to become a party to the Dealer Agreement(s)." (*Id*. at 1, ¶ B). Furthermore, "[t]he execution of the Dealer Agreement(s) by Ford is the only manner in which this application will be approved." (*Id*. at ¶ C). The Smiths understood the terms of the Prospective Dealer Application above. (T. Smith Dep. at 129:6-10).

Yet, the Stock Sale Agreement was not contingent on receiving the consent of either Ford or Kia for the Smiths to become dealers. (*See* Stock Sale Agreement). During negotiations, however, Attorney Bohorad attempted to insert such a contingency provision. (*See* Draft Stock Sale Agreement, Doc. 99-15, Ex. L, at 14, ¶ 15(F)) ("This Agreement shall be contingent upon the parties' receipt of written consent of the purchase of Seller's stock by Buyers from Ford Motor Company and Kia Motors America. If such consent is not received . . . this Agreement shall terminate."). Tom Smith explained that the provision was deleted because he was "relying on Pete. Pete [Maxwell] told me that Chet wanted this taken out because it would take two years to get a dealership." (T. Smith Dep. at 354:4-6). Tom Smith denied that the provision was negotiated out of the agreement, but "[t]hey just recommended we take it out." (*Id*. at 354:14-15). When asked, "you agreed to take it out?" Tom Smith responded, "[y]es. I was explaining it takes two years to get approved." (*Id*. at 354:16-18). Though Tom Smith completed a Prospective Dealer Application and the Smiths gave it to Maxwell to forward to FMC, Maxwell never submitted it or other documentation required by FMC for dealer approval prior to closing. (Stewart Dep. at 56:18-57:5, 65:17-24; L. Smith Dep. at 112:3-4).

Attorney Bohorad also attempted to revise the language of the Stock Sale Agreement to reflect that Smith Defendants' access to the books and records of Heritage and knowledge of its financial condition had been "based on information provided by Seller." (Bohorad Dep. at 74:22-75:11; Draft Stock Sale Agreement, Doc. 99-16, Ex. M, at 3; June

5, 2007 Bohorad Letter to Tom Smith, Doc. 99-18, Ex. O, at 4, ¶ 7). Nevertheless, the final Stock Sale Agreement did not include Attorney Bohorad's suggested language. (Stock Sale Agreement, ¶ 5(A)).

Attorney Bohorad also "recommend[ed] deleting the sentence stating 'Smith agrees and acknowledges that he shall be charged with such knowledge as a result of his relationship to Maxwell.'" (June 5, 2007 Bohorad Letter to Tom Smith, at 4, ¶ 7). In Attorney Bohorad's initial review of the draft Stock Sale Agreement, he wrote "NO*" beside the provision in which the Smiths were charged with the knowledge of Maxwell. (Draft Stock Sale Agreement, Doc. 99-16, Ex. M, ¶ 5(B)). The final Stock Sale Agreement, however, retained the provision charging Smiths with Maxwell's knowledge. (See Stock Sale Agreement at ¶ 5(B)).

## III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

13

of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. **Analysis**

FMC seeks liability against Maxwell and Smith Defendants on the basis of the Continuing Guaranties they executed in favor of FMC in October 2007. (Doc. 105, at 9). The Court is unsure of whether Maxwell and Smith Defendants ultimately obtained approval from Ford to operate as dealers at Heritage. Smith Defendants' Brief in Opposition to FMC's motion for summary judgment indicates that at least as of October 2007, the Smiths had not been approved as dealers for Ford. (Doc. 110, at 3; Amended Third-Party Complaint, Doc. 52, ¶ 57, *see also* Smith Answer, Doc. 23-1, Ex. A). On the other hand,

FMC indicates that Maxwell and Smith Defendants executed the Continuing Guaranties "to induce Ford Credit to continue to extend financing to Heritage under the Wholesale Agreement." (Doc. 105, at 4). Nevertheless, that issue has no bearing as to whether Defendants are liable to FMC.

Under Pennsylvania law, a party asserting a breach of contract claim "must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011) (internal citations and quotation marks omitted).

Smith Defendants argue that while they were signatories to the Continuing Guaranties, they were not parties to either the Wholesale Agreement or the Security Agreement which Stewart had signed on Heritage's behalf in 1988. (*See* Doc. 103-1, Ex. A; Doc. 103-2, Ex. B). Lori Smith claims that at the time of the stock transfer, she did not realize that she and her husband would be taking on Heritage's existing financial obligations. "I did not know that. You may find that to be unbelievable, but I did not know that." (L. Smith Dep. at 283:9-10). She also claims that her understanding at the time of closing was that any obligations of the dealership prior to July 6, 2007 would be paid by Stewart. (L. Smith Dep. at 354:15-356:5, 376:11-377:1). She believed that Attorney Bohorad

would have a conversation with Stewart at or prior to closing regarding a reconciliation of what was owed by Heritage as of the closing. (*Id.* at 282:7-25). Therefore, Smith Defendants argue, they cannot be held liable for any of Heritage's alleged breaches of the Wholesale or Security Agreement.

This argument is unavailing because the language of the Stock Sale Agreement does not reflect Smith Defendants' understanding of their arrangement with Stewart, and it is the parties' intent as expressed in the contract that controls its interpretation. *Lesko*, 15 A.3d at 342. The agreement between Defendants (Smiths and Maxwells) as buyers and Stewart as seller specifically says "Agreement for Sale of Stock" in capital letters as the heading of page one of the Agreement. Under a sale of stock, a new owner acquires ownership in the entire entity; meaning, a new owner acquires a company's assets *and* its liabilities. *See, e.g., Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 954 (Pa. 2012) ("a purchaser of a corporation's *assets* does not, for such reason alone, assume the debts of the selling corporation, unlike a purchaser of the corporation's *stock*.") (emphasis added); *LTV Steel Co., Inc. v. W.C.A.B. (Mozena)*, 754 A.2d 666, 670 (Pa. 2000) ("through stock sales, which resulted in the total purchase of J & L in 1974, LTV assumed *all assets and liabilities* of J & L.") (emphasis added). Lori Smith acknowledged that this was so in her deposition. (L. Smith Dep. at 283:12-17, 359:2-6). Therefore, the obligations contained within the Wholesale Agreement and Security Agreement ran with Heritage, not

16

with Stewart. Once Smith Defendants purchased their ownership interest in Heritage, they took on those obligations to which Heritage was bound.

Yet, Smith Defendants contend that they did not understand the significance of what a stock sale was at the time they signed the agreement. Lori Smith, a signatory to the Stock Sale Agreement, testified she "never saw the agreement" and was not involved in any of the terms being negotiated. (L. Smith Dep. at 123:9-17; Stock Sale Agreement at 15). Likewise, Tom Smith could not recall whether he and his wife ever reviewed the agreement before signing it. (T. Smith Dep. at 348:16-19). "A written contractual obligation may not be nullified because a party who signs it recklessly, and in complete disregard of his own interests and the rights of others, refuses to take the common precaution of reading what is plainly written on the instrument before him." *Berardini v. Kay*, 192 A. 882, 884 (Pa. 1937). "It falls stale upon the ear to be told that a formal contract was not read, or was hurriedly prepared, or was signed in haste. Such things are no ground for reforming or invalidating a contract." *Thrasher v. Rothrock*, 105 A.2d 600, 604 (Pa. 1954). A failure to read the Stock Sale Agreement does not negate Smith Defendants' obligations under its terms. Therefore, FMC must establish that Defendants, as owners of Heritage, breached their contract with FMC (Continuing Guaranties) by failing to pay the sums owed by Heritage to FMC pursuant to Heritage's agreements (Wholesale Agreement and Security Agreement) with FMC.

In support of its motion for summary judgment, FMC relies heavily on the affidavit of James Mullen, a Commercial Risk Analyst at FMC. (Mullen Aff. at ¶ 1). Smith Defendants

do not dispute the accuracy or content of the affidavit, but challenge the admissibility of Mullen's affidavit and the attached Statement of Loss.

In his affidavit, Mullen swears he is "familiar with this action and [has] knowledge of the facts set forth in" it. (*Id.* at ¶ 2). On the strength of Mullen's affidavit, FMC seeks to prove that sometime "[i]n 2007, Heritage began suffering financial difficulties, and was unable to meet its contractual obligations under the Wholesale Agreement." (*Id.* at ¶ 20). "By December of 2007, Heritage had defaulted on the Wholesale Agreement" by failing to remit to FMC payment for vehicles it had sold. (*Id.* at ¶ 21). As a result, Heritage was "out of trust" and FMC "accelerated all amounts due under the Wholesale Agreement to be immediately payable." (*Id.* at ¶ 23). Mullen's affidavit does not indicate how he knows these alleged facts. Based on these statements alone, the Court cannot find that Mullen's statements are based on personal knowledge. *Compare with Condus v. Howard Savings Bank*, 986 F. Supp. 914, 918 (D.N.J. 1997) ("the testimony of Olson establishes that Speer employees created the Speer Reports after they interviewed a number of officers of the bank and reviewed Howard's loan policies and procedures, Howard's grading of loans, a summary of statistics on the consumer loan portfolio, and a portion of the commercial mortgage and commercial loans that were approved by the loan committee. Therefore, the persons responsible for the Speer Reports had personal knowledge of the matters contained within them.").

FMC's motion for summary judgment as to Smith and Maxwell Defendants' liability, however, does not necessarily fail. Other evidence exists in the record to reflect that Heritage defaulted on its obligations under the Wholesale and Security Agreements, and Defendants failed to meet their obligations under the Continuing Guaranties which entitle FMC to summary judgment as to liability.

Defendants purchased their ownership interests in Heritage on July 6, 2007. (See Stock Sale Agreement). They then executed Continuing Guaranties in favor of FMC on October 1, 2007 after FMC suspended Heritage's line of credit in August 2007. (Doc. 103-3, Ex. C; Doc. 103-4, Ex. D; P. Maxwell Dep. at 106:11-18). After FMC reinstated Heritage's line of credit on October 25, 2007, FMC conducted audits of Heritage in November and December 2007 and found several vehicles had been sold out of trust. (P. Maxwell Dep. at 106:11-18; Kasper Dep. at 61:5-14, 63:6-18, 64:8-17). Within days, FMC again withdrew Heritage's line of credit, declared Heritage to be in default, and "Heritage ceased business operations for all purposes on or about December 24, 2007." (P. Maxwell Dep. at 106:19-23; Mullen Aff. at ¶ 23, Smith Answer at ¶ 2). FMC then mailed demand letters to Maxwell and Smith Defendants in August 2008, followed by a second set in September 2009. (Doc. 104, Exs. 7, 8, 9, 10). Maxwell and Smith Defendants never tendered the amount demanded to FMC. (Maxwell Answer at ¶ 46; Smith Answer at ¶ 46).

Despite the above evidence, Smith Defendants argue that even if they are bound by the Wholesale Agreement, there exists ambiguity in its wording. Specifically, Smith

Defendants claim that the phrase "faithfully and promptly" pay is nowhere defined in the Wholesale Agreement and that reasonable minds could differ as to its meaning. In support of their position, Smith Defendants rely on *Mente Chevrolet Oldsmobile Inc. v. GMAC*, 728 F. Supp. 2d 662 (E.D. Pa. 2010), a case in which the district court found an ambiguity in the phrase "faithfully and promptly" pay and permitted the jury to interpret its meaning. "GMAC argued the term required immediate payment, transferred to GMAC the same day a vehicle was sold. Plaintiffs argued, based on their prior course of dealing with GMAC, they were authorized to wait for their receipt of third-party funds before paying GMAC." *Id.* at 666. Here, though the precise meaning of the phrase "faithfully and promptly" might be in doubt, what is undisputed is that Defendants never remitted full payment for cars sold out of trust and never expressed a willingness or ability to pay the outstanding balance.

In *Mente*, the plaintiffs presented evidence that GMAC conducted an audit of the dealership on July 19, 2007, demanded immediate payment of over $300,000 for cars missing from the lot, refused to wait an additional day until the 20th for the dealership's financial controller to return from vacation, and that same day, "sent eight guards to the [dealership] and GMAC agents seized the titles, keys, and manufacturer's certificates of origin for all cars" at the dealership. *Id.* at 667. The plaintiffs also "claimed they had funds available to pay GMAC $269,405 on July 19 and approximately $400,000 on July 20." *Id.* The situation in this case bears little similarity to that in *Mente*.

As stated before, FMC conducted an audit of Heritage on November 14, 2007 and another on December 6, 2007. (Kasper Dep. at 61:5-14, 63:6-18). After the second audit, FMC concluded that sixteen vehicles had been sold "out of trust" totaling $355,000 as of December 6, 2007. By December 10, 2007, $273,219 of the out of trust amount remained unpaid. (Kasper Dep. at 64:8-17). On December 12, 2007, FMC withdrew Heritage's line of credit for a second time. (P. Maxwell Dep. at 106:19-23). FMC declared Heritage to be in default (Mullen Aff. at ¶ 23), and Heritage ceased doing business soon thereafter. (Smith Answer at ¶ 2).

Unlike in *Mente*, FMC was not demanding remittance on the same day that Heritage sold a vehicle. In fact, FMC did not declare a default after the first audit when one car was found to have been sold out of trust, but only after the second when it found sixteen cars had been sold out of trust. Though Heritage paid a portion of the $355,000 outstanding to FMC by December 10, 2007, there is no indication that Heritage was willing or would have been able to pay the full balance no matter how much time FMC gave Heritage. Under any definition of "promptly pay," Heritage failed to remit payment to FMC in a timely manner under the Wholesale Agreement and then Defendants failed to pay the obligations of Heritage under the Continuing Guaranties.[3]

To prove FMC's damages, Mullen cites to a Statement of Loss (Doc. 103-5, Ex. E) which purportedly states the amount Defendants owed to FMC after Heritage closed for

---

[3] In fact, Smith Defendants sent a letter to FMC dated January 15, 2008 expressly denying any obligation to pay FMC any sums they owed to it. (Doc. 23-1, Ex. A).

21

business and FMC liquidated Heritage's vehicles and sold its remaining inventory to offset

the outstanding balance to FMC. Smith Defendants do not dispute the amount demanded

by FMC, but argue that the Statement of Loss is inadmissible evidence. FMC argues that

the Statement of Loss falls under the business record exception to the hearsay rule under

FED. R. EVID. 803(6) which says:

> A record of an act, event, condition, opinion, or diagnosis [is admissible] if:
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Mullen does not appear to be the custodian of records at FMC, but Rule 803(6) does not

require him to be. "Another qualified witness" may provide foundation testimony as to the

authenticity and accuracy of the document at issue. "Furthermore, the phrase 'other

qualified witness' should be given the broadest interpretation; . . ." a witness will be qualified

as "long as he understands the [record-keeping] system." *United States. v. Pelullo*, 964 F.2d

193, 201 (3d Cir. 1992). In certain instances, "the requirements for qualification as a

business record can be met by documentary evidence, affidavits, or admissions of the

22

parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence." *Id*. "Thus, a qualified witness only need have familiarity with the record-keeping system and the ability to attest to the foundational requirements of Rule 803(6)." *United States v. Console*, 13 F.3d 641, 657 (3d Cir. 1993). Nevertheless,

> [w]hile a noncustodial witness . . . may be used to lay the foundation required by Rule 803(6), that witness or those documents must still demonstrate that the records were made contemporaneously with the act the documents purport to record by someone with knowledge of the subject matter, that they were made in the regular course of business, and that such records were regularly kept by the business.

*Pelullo*, 964 F.2d at 201.

Mullen, as a Commercial Risk Analyst, states that "[t]he Statement of Loss is a business record of Ford Credit, which is kept in the course of Ford Credit's regularly conducted business, by individuals at Ford Credit whose duty it is to make and keep that record, and to accurately report the amounts reflected therein." (Mullen Aff. at ¶ 27). He goes on to state that it is "the regular practice of Ford Credit to generate a Statement of Loss *whenever* a dealer defaults on its obligations to Ford Credit, and that default leads to the liquidation of the collateral pledged by the dealer, resulting in a deficiency owed to Ford Credit." (*Id*. at ¶ 28) (emphasis added). *See Condus*, 986 F. Supp. at 918 ("Speer's preliminary assessment was made on January 26, 1990, less than a month after Speer began working on the Howard project. Speer's final report was finished on March 5, 1990 and presented to Howard on March 6, 1990, a little more than two months after Speer began working on the Howard project. Furthermore, the investigation and fact-gathering

used to create the Speer Reports were conducted right up until the presentation of the final report. Clearly, therefore, the material contained in the Speer Reports was recorded "at or near the time" the information was obtained."). After FMC liquidated Heritage's vehicles and sold off Heritage's inventory, the Statement of Loss was issued on July 19, 2008 and revised on August 27, 2008. (Doc. 103-5, Ex. E).

The Court finds that the Statement of Loss meets the business record exception to the hearsay rule but will defer ruling on the amount of damages until FMC files supplemental evidence of damages detailing: (1) substantiation in admissible form of the underlying transactions contained within the Statement of Loss, (2) interest calculations and the bases therefor, (3) substantiation of attorneys' fees, whether based on the 15% rate contained within the Continuing Guaranties or based on an hourly rate or both, and (4) any additional fees sought and the basis for those fees.[4]

Smith Defendants have raised a number of affirmative defenses, including laches, estoppel, waiver, unclean hands, failure of consideration for the Continuing Guaranties, and fraud-in-the-inducement. (Smith Ans. at ¶¶ 53-59). In their Brief in Opposition to FMC's motion for summary judgment, they appear to have abandoned their affirmative defenses of failure of consideration, unclean hands, and fraud-in-the-inducement, raising only laches, estoppel, and waiver. (See Doc. 110, at 20) ("the Court should also deny Ford's motion with

---

[4] The Court's request for additional information from FMC is not a criticism with respect to the affiant's basis of knowledge as to damages. Instead, the Court notes that Smith Defendants have admitted the event of default in the form of a failure to pay pursuant to the Continuing Guaranties, and it is only the Court's concern with the summary nature of the affidavit that prompts it to request additional information.

respect to the Smiths' waiver, equitable estoppel, and laches defenses. Ford's failure to enforce the requirement against Heritage Ford in a timely manner, on which the Smiths relied to their prejudice, provides the factual grounds for each of these defenses."). Yet, Smith Defendants have not shown any prejudice[5] they may have suffered by Ford's alleged delay in enforcing its Wholesale Agreement with Heritage.

Furthermore, although Smith Defendants claim vehicles had been sold out of trust before July 6, 2007, there is no evidence that FMC was aware of the situation yet failed to act, given that there is no evidence that FMC conducted an audit near the time of closing. Even if FMC had been aware of cars sold out of trust prior to the audits in November and December of 2007, one instance in or around July 2007 alone does not establish a course of conduct. In fact, the Wholesale Agreement specifically states that Heritage "agrees that the acceptance by Ford Credit of any payment after it may have become due or the waiver by Ford Credit of any other default shall not be deemed to alter or affect Dealer's obligations or Ford Credit's right with respect to any subsequent payment or default." (Wholesale Agreement at ¶ 10). If FMC did waive any of its rights under the Wholesale Agreement prior to July 6, 2007, those waiver(s) did not extinguish its right to declare a default in December 2007. As such, the Court will grant FMC's motion for summary judgment as to liability and

---

[5] *Cnty. of Carbon v. Panther Valley Sch. Dist.*, 61 A.3d 326, 332-33 (Pa. Commw. Ct. 2013) ("The doctrine of laches bars relief when the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice."); *Style v. Shaub*, 955 A.2d 403, 408 (Pa. Super. Ct. 2008) ("a finding of estoppel must be based upon a demonstration of detrimental reliance by the party asserting the doctrine."); *Berwick v. Daniel W. Keuler Realtors, Inc.*, 595 A.2d 1272, 1274 (Pa. Super. Ct. 1991) ("the person claiming the waiver to prevail must show that he was misled and prejudiced thereby.").

25

will defer ruling on FMC's damages until FMC submits supplemental briefing and evidence consistent with the Court's instructions above.

## As to Stewart

Smith Defendants sue Stewart, also under a breach of contract theory, claiming that

Stewart breached several provisions of the Stock Sale Agreement.

### Allegations with respect to ¶ 4(F): Title to Properties

Smith Defendants claim that Stewart breached ¶ 4(F) by failing to disclose Ford's

security interest in Heritage which arose when Stewart executed a Security Agreement on

Heritage's behalf in 1988. (Doc. 103-2, Ex. B). Paragraph 4(F) of the Stock Sale Agreement

states:

F. *Title to Properties.* To the best of the knowledge and belief of Seller, except as otherwise set forth herein, the Corporations [Heritage and Kia] own outright, and have good and marketable title to, all of their personal property free and clear of all liens, pledges, security interests, conditional sales contracts or other encumbrances of any nature whatsoever, except for the lien of current taxes not yet due and payable.

(Stock Sale Agreement, at 4, ¶ 4(F)). The Security Agreement executed by Stewart on

behalf of Heritage granted to FMC a security interest in "[a]ll furniture, fixtures, machinery,

supplies and other equipment," "[a]ll motor vehicles, tractors, trailers, implements, service

parts and accessories and other inventory of every kind," and "[a]ll accounts, contract rights,

chattel paper and general intangibles." (Doc. 103-2, Ex. B, at ¶¶ a, b, c). Clearly, FMC had

a security interest in Heritage at the time Smith Defendants purchased Stewart's ownership

interest in Heritage.

Yet, the undisputed evidence shows that Smith Defendants were aware of Ford's security interest in Heritage through the floor plan it held with Ford and that Heritage had existing franchise agreements with FMC. (Schuylkill County Complaint at ¶¶ 21, 26; L. Smith Dep. at 465:20-466:24; Bohorad Dep. at 46:1-23, 48:10-24, 110:7-12).

> Waiver is the voluntary and intentional abandonment or relinquishment of a known right. Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.

*Prime Medica Associates v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1156-57 (Pa. Super. Ct. 2009) (internal citations and quotation marks omitted). Though Smith Defendants were aware that Heritage did not own all of its own personal property "free and clear of all liens, pledges, security interests, conditional sales contracts or other encumbrances of any nature whatsoever," they proceeded with closing on the Stock Sale Agreement. Therefore, they waived their right to claim a breach of this claim on the basis of Stewart's purported failure to disclose Ford's security interest in Heritage. Indeed, with respect to paragraph 4(F), when asked what was inaccurate about the provision, Lori Smith responded, "nothing." (L. Smith Dep. at 279:9-12). Finally, even if the Court were to find that Stewart breached this paragraph of the Stock Sale Agreement, Smith Defendants have not shown they suffered any damages as a result of this breach.

*Allegations with respect to ¶¶ 4(H): Absence of Undisclosed Liabilities, 4(N): Disclosure, and 4(O): Financial Information*

Smith Defendants claim that Stewart breached ¶¶ 4(H), 4(N), and 4(O) by failing to

disclose liabilities on several cars Heritage had sold for which it had not remitted payment to

FMC by the date of closing. These particular paragraphs of the Stock Sale Agreement

state:

> H. *Absence of Undisclosed Liabilities.* To the best of the knowledge and belief
> of Seller, the Corporations have no liabilities or obligations accrued, absolute,
> contingent or otherwise, except as disclosed in this Agreement or as incurred,
> consistent with past business practice, in the normal and ordinary course of
> its business since the date of the Financial Statements and none of which is
> material.
>
> N. *Disclosure.* No representation or warranty by the Seller in this Agreement
> or in any other exhibit, list, certificate or document delivered pursuant to this
> Agreement, contains or will contain any material omission or untrue statement
> of material fact.
>
> O. *Financial Information.* To the best of Seller's knowledge, all corporate
> records and financial information regarding Heritage and Kia made available
> by Seller to Buyers for review, including, but not limited to, books, records and
> tax returns, is true and accurate.

(Stock Sale Agreement, at 4, ¶¶ 4(H), 4(N), 4(O)). With respect to these provisions of the

Stock Sale Agreement, Smith Defendants claim they never had the full picture of Heritage's

financial status before closing. Specifically, both Attorney Bohorad and Pothering believed

that certain numbers were not adding up and Pothering informed Tom Smith about her

concerns that Heritage might be out of trust with FMC. (Bohorad Dep. at 66:18-67:12, 73:4-

17; Pothering Dep. at 53:16-23, 59:25-60:1, 76:6-25, 82:9-11, 98:1-5, 103:23-25, 110:17-20;

T. Smith Dep. at 303:22-304:8).

Pothering's notes indicate she had difficulty obtaining information she had requested about Heritage's financial condition and that she had sought Peter Maxwell's assistance in retrieving the documents from Stewart. (Pothering Notes, Doc. 99-17, Ex. N, at Smith 1730 (6/2007 entry); see also 6/11/2007 entry). Pothering's notes also state that "Tom [Smith] informed me that he will not be speaking to Chet [Stewart] directly and that [Maxwell] will be handling negotiations with [Stewart]." (Id. (4/4/2007 entry)). Stewart acknowledged that he received a request for information from the Smiths through Maxwell and that he "told [Maxwell] to give them whatever they needed." (Stewart Dep. at 52:16-23, 53:2-3).

According to Tom Smith, he agreed to the language in the final Stock Sale Agreement despite his reservations about the financial state of Heritage because he "felt those were put to rest or I wouldn't have went to closing." (Id. at 352:11-15). Smith was then asked, "they were put to rest because you relied upon your attorney to do so?" to which he responded, "[y]es." (Id. at 352:16-18). As a follow-up question, Smith was asked "[b]ut not because of anything that Chet said to you in any fashion because again you never spoke with him, agreed?" Smith answered, "[a]greed." (Id. at 352:19-22). Lori Smith said, she didn't "know what Chet knew" with respect to whether Stewart knew that the records and financial information made available to them was inaccurate (Id. at 293:23-294:1). Though Smith Defendants claim they were misled into believing that Heritage would come free and clear of any financial obligations, they have not attributed any of their misconceptions to Stewart, himself.

The undisputed evidence shows that Smith Defendants were aware that Pothering had not received everything she felt was necessary, they never spoke directly to Stewart about the financial condition of Heritage,[6] and all contact with Stewart went through Maxwell. Tom Smith's concerns were "laid to rest" because of assurances given to him by his lawyer, not Stewart. Furthermore, the language of paragraphs 4(H) and 4(O) states "to the best of the knowledge and belief of Seller," there were no undisclosed liabilities at Heritage at the time of closing and all corporate records made available to Buyers were true and accurate. Therefore, Smith Defendants have not demonstrated there is a disputed issue of fact as to what Stewart knew or believed when he made his disclosures to them.

Smith Defendants, unable to attribute any liability to Stewart directly, attempt to do so indirectly by claiming that Maxwell was acting as Stewart's agent during the negotiations leading up to the closing. Under this theory, Maxwell's failures would be Stewart's failures. Smith Defendants blame Maxwell for his failure to obtain the necessary documents from Stewart, or conversely, they blame Stewart for not turning over the requested financial documents to Maxwell. Previously, when the Court dismissed Smith Defendants' *respondeat superior* claim against Stewart, the undersigned held "[t]his is not an independent cause of action under Pennsylvania law, nor is there any evidence to suggest that Peter Maxwell was acting as Stewart's agent in executing the Stock Sale Agreement.

---

[6] In fact, the only conversation Tom Smith ever had with Stewart prior to closing involved a discussion about Stewart's demands for titles to a car and motorcycle as part of the transaction. (T. Smith Dep. at 132:16-20).

In fact, Maxwell is characterized as a Buyer along with the Smiths." (May 14, 2012 Memorandum Opinion, Doc. 90, at 5).

Despite this earlier ruling by the Court, Smith Defendants persist in arguing that Maxwell was Stewart's agent during the time leading up to the sale of Stewart's 91% interest to Maxwell and Smith Defendants. The Court finds as a matter of law that there was no agency relationship between Maxwell and Stewart in connection with the Stock Sale Agreement. Under Pennsylvania law, the three basic elements of agency are: "(1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal." *Tribune-Review Pub. Co. v. Westmoreland Cnty. Housing Auth.*, 833 A.2d 112, 119-120 (Pa. 2003) (internal citations and quotation marks omitted).

> "[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d 476, 480 (1971). The burden of establishing an agency relationship rests with the party asserting the relationship. *Scott*, 490 Pa. at 117 n. 8, 415 A.2d at 61 n. 8. "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff*, 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987), citing Restatement (Second) of Agency § 387 (1958). Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information.

*Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000). "Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's

31

relationships with third parties, such as binding the principal to a contract." *Id.* at 1121.

Furthermore, in the absence of an "agreement as to fees in a definite amount," an agent is

entitled to compensation for the reasonable or "fair value of his services." *Betz v. Sykes*,

118 A.2d 219, 220 (Pa. 1955).

First, there is no evidence of any agreement between Maxwell and Stewart that

Maxwell would act on Stewart's behalf. Tom Smith himself acknowledged that he was not

aware of anything in the Stock Sale Agreement that suggested Maxwell was acting as

Stewart's agent, (T. Smith Dep. at 345:2-5), and the Stock Sale Agreement contains no

such language establishing an agency relationship between Maxwell and Stewart. Second,

there is no evidence that Maxwell had any authority on Stewart's behalf to "alter [Stewart's]

relationships with [Maxwell and Smith Defendants], such as binding the principal to a

contract." Had Maxwell had such authority, there would have been no need for both Maxwell

and Stewart to sign the Stock Sale Agreement. Maxwell's signature would have been

sufficient on its own. Additionally, Maxwell and Stewart would not have needed separate

attorneys to represent them during the transaction. (T. Smith Dep. at 345:7-15

(acknowledging that each party to the Stock Sale Agreement was represented by his own

attorney)). Finally, there is no evidence that Maxwell received any compensation from

Stewart related to services Maxwell rendered to Stewart during the negotiations leading up

to the Stock Sale Agreement. As such, Smith Defendants have failed to meet their burden

that an agency relationship existed between Maxwell and Stewart. Because Maxwell was

not acting as Stewart's agent, any failures of Maxwell to obtain the full financial records cannot be attributed to Stewart.

Even assuming that Stewart (or that Maxwell, as Stewart's agent) failed to disclose Heritage's liability to FMC on these vehicles sold prior to closing, Smith Defendants have not shown that Heritage incurred these financial obligations inconsistent with past business practice or out of the normal and ordinary course of business. Heritage is in the business of selling vehicles. Tom Smith, as a former General Manager and Finance Manager at Heritage, and as a proprietor for Smith Cars, would have known of such liabilities arising in the course of the normal and ordinary course of business of a car dealership. (T. Smith Dep. at 94:1-12; Prospective Dealer Application, at 2). In fact, Lori Smith agreed that such obligations were incurred in the ordinary course of business. (L. Smith Dep. at 292:23-293:1). These were not extraordinary obligations that Heritage took on.

Tom Smith filed an affidavit attached to Smith Defendants' Brief in Opposition to FMC's motion for summary judgment. In his affidavit, he claims that Heritage already was out of trust as early as "an approximately one-month period preceding the July 6, 2007 closing." (T. Smith Aff., Doc. 108-1, Ex. C at ¶ 3). He avers that he came by this knowledge after the July 6, 2007 closing by "conduct[ing] research in Heritage Ford's recent vehicle sales and inventory records," and he "made a contemporaneous, or nearly contemporaneous handwritten document that summarizes, and truly and accurately reflects, [his] findings." (Id. at ¶ 4). Although "the handwriting on the top portion is that of a Heritage

Ford employee, the notations therein were dictated by [Tom Smith] or made at [his] direction." (*Id.* at ¶ 5). Through his research, Tom Smith discovered that between June 14 and July 6, 2007, "Heritage Ford, while still owned and operated by Stewart, sold 10 vehicles and earned a total of $266,180.19." (*Id.* at ¶ 6). On some of the vehicles, Heritage did not remit payment to FMC until almost nine weeks after the vehicles had been sold. Stewart counters that the Court should not consider the affidavit because it violates the "sham affidavit doctrine." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.").

Even if the Court were to conclude that Tom Smith's affidavit is not a sham, it does not see how this affidavit necessarily supports Smith Defendants' position. The affidavit and attached exhibit purportedly show that Heritage sold a certain number of cars and remitted payment to FMC with varying degrees of alacrity. There is no evidence that these financial obligations were incurred out of the ordinary course of business by Heritage while owned by Stewart. The affidavit and attached exhibit also do not indicate that Stewart himself withheld the disclosure of these sales prior to the closing on July 6, 2007. Moreover, the affidavit is at odds with Smith Defendants' representations in the Stock Sale Agreement that they "had full and unrestricted access to the books and records of Heritage and Kia and have complete knowledge of the financial condition, assets and liabilities of Heritage and Kia." (Stock Sale

Agreement, at ¶ 5(A)). Finally, if Tom Smith did conduct this research as he claims, he

should have done it prior to closing, as he represented that he did in the Stock Sale

Agreement: "Buyers are not relying on any representation or warranty of the Seller other

than those contained in this Agreement, but rely on their own independent knowledge and

investigation of the subject matter of this transaction as the Buyers shall have determined to

be appropriate." (*Id.* at ¶ 5(C)).

### Miscellaneous Provisions

Smith Defendants argue that it was Stewart's responsibility to ensure that Ford

received their Dealer Application and that they had access to the books of Heritage. Smith

Defendants rely on the following provisions of the Stock Sale Agreement:

10(H). *Further Assurances.* Buyer and Seller will, at the request of the other
from time to time, execute and deliver such further instruments and will take
such other action reasonably required to consummate the transactions
contemplated by this Agreement.

13. *Conduct Pending the Closing.* The Sellers hereby covenant and agree
that, pending the Closing and except as otherwise approved in advance in
writing by the Buyers:

. . .

B. *Access.* To the extent that any of the following are known to or in the
possession or control of Seller and not otherwise available to Maxwell, the
Buyers and their authorized representatives shall have full access during
normal business hours upon prior arrangement with the Seller to the
Properties, books, records, contracts and documents of Heritage and Kia
known to and/or in the possession or control of Seller.

35

(*Id.* at ¶¶ 10(H), 13). Although Smith Defendants had not asserted a claim based on paragraph 10(H) previously, the Court will address this claim.

First, the provision states that "Buyer and Seller will, at the request of the other" take certain actions. There is no evidence that Smith Defendants ever requested Stewart to do anything on their behalf with respect to the Dealer Application. Tom Smith himself said the only time he ever spoke to Stewart was the day before the closing to discuss a car and motorcycle that Stewart wanted as part of the purchase price. (T. Smith Dep. at 132:16-20).

Second, simply because Smith Defendants gave the Dealer Application to Maxwell to submit to FMC "which Maxwell failed to do in a timely manner" (Doc. 107, at 5; *see also* Stewart Dep. at 56:18-57:5, 65:17-24; L. Smith Dep. at 112:3-4), does not meant that it was Stewart's responsibility to ensure that Maxwell submitted the proper paperwork to FMC. (*See* Court's discussion of agency *supra*). Although Lori Smith testified that her understanding at the time of closing was "that Ford knew that we were going to be taking over, that it was just a formality" to obtain consent, that she "was told by Pete that, yes, that Ford was okay with us," and she "believed that everything that [they] had to present [to Ford] was presented" (L. Smith Dep., Doc. 106-1, Ex. A, at 106:17-23, 107:11-14, 127:10-11), the language of the Stock Sale Agreement did not obligate Stewart to do anything with respect to the dealer approval process.

Third, the paragraph provides that the parties "will take such other action reasonably required to consummate the transactions contemplated by this Agreement." The transaction

contemplated by the agreement was the transfer of stock from Stewart to the Maxwells and Smiths. Nowhere in the Stock Sale Agreement is approval from Ford required to complete the transfer of stock ownership. In fact, despite Attorney Bohorad's efforts to insert contingency language, the Stock Sale Agreement did not make the transfer of stock contingent upon approval of the Smiths as dealers by Ford. Therefore, Stewart did not breach ¶ 10(H) of the Stock Sale Agreement.

With respect to ¶ 13(B), Smith Defendants' claim also fails. The provision pertains to the parties' conduct before closing, but the parties did not execute this agreement until the day of closing, rendering its provisions moot. Even if the provision were not moot, there is no evidence that any of these documents were "not otherwise available to Maxwell." Stewart said he told Maxwell to give Smith Defendants "whatever they needed." (Stewart Dep. at 53:2-3). Lastly, Smith Defendants represented that they "had full and unrestricted access to the books and records of Heritage and Kia and have complete knowledge of the financial condition, assets and liabilities of Heritage and Kia." (Stock Sale Agreement, at ¶ 5(A)) (see infra).

### Effect of Buyer's Representations Contained in ¶¶ 5(A), (B), (C)

Stewart was not the only party to the Stock Sale Agreement who made representations and warranties. Smith Defendants expressly warranted in the Stock Sale Agreement that (1) "Maxwell has been employed by Heritage for many years as its general manager and is thoroughly familiar with all of its operations, financial books and records and

other corporate records," (2) "Buyers have had full and unrestricted access to the books and records of Heritage and Kia and have complete knowledge of the financial condition, assets and liabilities of Heritage and Kia," (3) "Maxwell acknowledges that he has been an active participant in the management of Heritage and Kia and that he is fully familiar with its financial condition, assets and liabilities. Smith agrees and acknowledges that he shall be charged with such knowledge as a result of his relationship to Maxwell," and (4) "Buyers are not relying on any representation or warranty of the Seller other than those contained in this Agreement, but rely on their own independent knowledge and investigation of the subject matter of this transaction as the Buyers shall have determined to be appropriate." (Stock Sale Agreement, at 1, ¶ 5(A), (B), (C)).

Despite Attorney Bohorad's efforts[7] to make the Stock Sale Agreement contingent upon first receiving approval from Ford for Smith Defendants to operate Heritage as dealers, to amend the provisions attributing knowledge of Heritage's financial condition "based on information provided by Seller," and to delete the provision attributing all knowledge of Maxwell to Smith Defendants, the final Stock Sale agreement contained none of his suggested edits. (Compare June 5, 2007 Bohorad Lette, at 4, ¶ 7; Dract Stock Sale Agreement, Doc. 99-15, Ex. L, at 14, ¶ 15(F); Draft Stock Sale Agreement, Doc. 99-16, Ex. M, at 3 *with* final Stock Sale Agreement). "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of

---

[7] Smith Defendants apparently have also filed suit against Attorney Bohorad in connection with his representation during the negotiations leading up to the closing. (T. Smith Dep. at 305:15-306:1).

38

the parties is the writing itself." *Lesko*, 15 A.3d at 342. Smith Defendants are bound by the representations they made in the Stock Sale Agreement, and as such, their breach of contract claim against Stewart fails.

Therefore, for all of the above reasons, the Court will grant Stewart's motion for summary judgment.

## V. **Conclusion**

For the foregoing reasons, the Court will grant both motions for summary judgment as to liability and order supplemental briefing on FMC's damages. A separate Order follows.

Robert D. Mariani
United States District Judge